**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**


| | | |
|---|---|---|
| **JULIETA GARIBAY,** *et al.* | § | |
| | § | |
| **vs.** | § | **Civil Action No. 2:19-cv-00040** |
| | § | |
| **DAVID WHITLEY,** *et al.* | § | |
| | § | |


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY
APPLICATION FOR TEMPORARY RESTRAINING ORDER OR, IN THE
ALTERNATIVE, MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION..............................................................................................................1

FACTUAL BACKGROUND.........................................................................................1

   I.  Jane Doe #1 and Other U.S. Citizen Registered Voters Will Be Removed From Voter Rolls Absent Court Intervention………..………………………………………2

   II. The Secretary of State's Advisory .............................................................................4

   III. The Secretary of State's List of "Possible Non U.S. Citizens" Is Based on Arbitrary and Illegitimate Criteria.............................................................................7

   IV. Naturalizations in Texas..........................................................................................11

   V. The Matching Procedure Employed by Defendants Has and Will Continue to Target Naturalized Citizens for Investigation and Removal From the Voter Rolls ...........12

   VI. Defendants Will Not Rescind the Advisory, Withdraw the Suspect Voter List, or Provide Written Guidance to Counties Regarding the Flaws in the Suspect Voter List...............................................................................................................................14

   VII.   Counties Continue to Investigate and Send Challenge Letters Using Wildly Different Standards…………………………………………………………………17

LEGAL STANDARD .................................................................................................19

ARGUMENT ...............................................................................................................20

   I.  Plaintiffs are Likely to Prevail on the Merits of Their Claims ..................................20

        A.    The Voter Purge Violates the Fourteenth Amendment Equal Protection Clause .................................................................................................20

        B.  Defendants Lack a Compelling Interest in Singling our Naturalized Citizens for the Voter Purge…………………………………………………….21

        C.  Defendants' Voter Purge is not Narrowly Tailored………………………23

        D.  The Voter Purge Violates the 1964 Civil Rights Act……………………..25

E.  The Voter Purge Violates the Fourteenth Amendment Equal Protection and Due Process Clauses Because it Treats Voters in a Disparate and Arbitrary Manner……………………………………………………26

II.  **Plaintiffs will Suffer Irreparable Harm if an Injunction is not Granted**……………………………………………………………..27

III.  **Plaintiffs' Threatened Injuries Outweigh any Alleged Injury to Defendants**……………………………………………………………30

IV.  **A Preliminary Injunction Would Serve the Public Interest**……………………..31

**CONCLUSION**………………………………………………………………32

## <u>TABLE OF AUTHORITIES</u>

Cases

*A. Philip Randolph Inst. v. Husted,*
   907 F.3d 913 (6th Cir. 2018)...................................................................... 32
*Bush v. Gore,*
   531 U.S. 98 (2000) ...................................................................................... 27
*Chalk v. United States Dist. Ct. Cent. Dist. of Cal.,*
   840 F.2d 701 (9th Cir. 1988)...................................................................... 31
*Clark v. Jeter,*
   486 U.S. 456 (1988) .................................................................................... 21
*Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.,*
   600 F.2d 1184 (5th Cir. 1979).................................................................... 21
*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,*
   710 F.3d 579 (5th Cir. 2013)...................................................................... 21
*Deerfield Med. Ctr. v. City of Deerfield Beach,*
   661 F.2d 328 (5th Cir. Unit B. Nov. 1981) .......................................... 28, 32
*DeLeon v. Perry,*
   975 F. Supp. 2d 632 (W.D. Tex. 2014)...................................................... 28
*Dunn v. Blumstein,*
   405 U.S. 330 (1972) .................................................................................... 32
*Elrod v. Burns,*
   427 U.S. 347 (1976) .................................................................................... 28
*Fish v. Kobach,*
   189 F. Supp. 3d 1107 (D. Kan.) ................................................................. 33
*Fish v. Kobach,*
   840 F.3d 710 (10th Cir. 2016).................................................................... 31
*Harper v. Virginia Bd. of Elections,*
   383 U.S. 663 (1966) .................................................................................... 27
*Hernandez v. State of Tex.,*
   347 U.S. 475 (1954) .................................................................................... 22
*Hoover v. Morales,*
   164 F.3d 221 (5th Cir. 1998)...................................................................... 20
*Hunter v. Hamilton Cty. Bd. of Elections,*
   635 F.3d 219 (6th Cir. 2011).................................................................. 27, 32
*Jackson Women's Health Org. v. Currier,*
   760 F.3d 448 (5th Cir. 2014)...................................................................... 20
*Janvey v. Alguire,*
   647 F.3d 585 (5th Cir. 2011)...................................................................... 21

*Jones v. Texas Dep't of Criminal Justice,*
  880 F.3d 756 (5th Cir. 2018)................................................................. 20, 32
*Melendres v. Arpaio,*
  695 F3d 990 (9th Cir. 2012)....................................................................... 32
*Mitchell v. Cuomo,*
  748 F.2d 804 (2d Cir. 1984)................................................................. 28, 30
*N.Y. Progress & Prot. PAC v. Walsh,*
  733 F.3d 483 (2d Cir. 2013)....................................................................... 32
*Patino v. City of Pasadena,*
  229 F. Supp. 3d 582 (S.D. Tex. 2017) ...................................................... 32
*Planned Parenthood of Gulf Coast, Inc. v. Gee,*
  862 F.3d 445 (5th Cir. 2017)...................................................................... 30
*Plyler v. Doe,*
  457 U.S. 202 (1982) .................................................................................. 22
*Qutb v. Strauss,*
  11 F.3d 488 (5th Cir. 1993).................................................................. 21, 22
*Reynolds v. Sims,*
  377 U.S. 533 (1964) .................................................................................. 32
*Rolf v. City of San Antonio,*
  77 F.3d 823 (5th Cir. 1996)....................................................................... 21
*Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.,*
  119 F.3d 393 (6th Cir. 1997)..................................................................... 31
*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015)..................................................................... 20
*United States v. Crawford,*
  229 F. Supp. 898 (W.D. La. 1964)............................................................ 27
*United States v. Lynd,*
  349 F.2d 785 (5th Cir. 1965)..................................................................... 27
*United States v. Ward,*
  345 F.2d 857 (5th Cir. 1965)..................................................................... 26
*Univ. of Tex. v. Camenisch,*
  451 U.S. 390 (1981) .................................................................................. 20
*Valle del Sol Inc. v. Whiting,*
  732 F.3d 1006, 1029 (9th Cir. 2013)......................................................... 32
*Wenner v. Tex. Lottery Comm'n,*
  123 F.3d 321 (5th Cir. 1997)..................................................................... 20
*Wis. Right to Life, Inc. v. Barland,*
  751 F.3d 804 (7th Cir. 2014)..................................................................... 32

Statutes

8 U.S.C. § 1427(a) ............................................................................................... 12
8 U.S.C. § 1430(a) ............................................................................................... 12
52 U.S.C. §20507 ................................................................................................ 24
52 U.S.C. §20507(a)(3) ....................................................................................... 24
52 U.S.C. §20507(a)(4) ....................................................................................... 24
52 U.S.C. § 10101 ............................................................................................... 27
52 U.S.C. § 10101(a)(2) ...................................................................................... 26
Tex. Elec. Code Ann. § 16.0332 ......................................................................... 31
Tex. Elec. Code Ann. §§ 16.061-16.064 ............................................................ 31
Tex. Elec. Code § 16.031 - 16.0332 ................................................................... 23
Tex. Elec. Code § 16.033 .................................................................................... 23
Tex. Elec. Code § 16.0332(a) ............................................................................. 24
Tex. Elec. Code § 18.068 .................................................................................... 24
Tex. Transp. Code Ann. § 521.041(a) ................................................................. 11
Tex. Transp. Code Ann. § 521.271 ..................................................................... 11

Rules

Rule 65 of the Federal Rules of Civil Procedure ........................................ 20

Regulations

37 Tex. Admin. Code § 15.101 ............................................................................ 11

**INTRODUCTION**

Plaintiffs seek a temporary restraining order (or preliminary injunction) to prevent immediate and irreparable injury that will result from the purging of Jane Doe #1 and other United States citizens from the Texas voter rolls in less than 21 days.  Plaintiffs' situation is urgent and requires the Court's immediate intervention to ensure that Jane  Doe #1 and other United States citizens do not lose the right to vote.

On January 28, 2019, Texas counties began to send purge letters to registered voters who had been named by the Texas Secretary of State as suspected non-U.S. citizens.  The purge letters notify voters that they have 30 days to provide proof of U.S. citizenship or the county will remove their names from the voter rolls.  Plaintiff Jane Doe #1 is one of those voters.  If she does not comply with the purge letter's demand and provide proof of U.S. citizenship she will lose her right to vote on March 4, 2019.

Plaintiffs[1] are under investigation by Defendants because they are U.S. citizens who immigrated to the United States.  Defendant state officials specifically culled state databases for registered voters who showed immigration documents to obtain their driver's licenses in past years.  Defendant state officials then placed those voters' names on a purge list with instructions to counties to investigate those voters for removal from the voter rolls.  Defendant counties have commenced the purge process against Plaintiffs and other voters by investigating their citizenship status and, in at least several hundred cases, by threatening to remove them from the voter rolls if they do not provide citizenship documentation.

Defendants' voter purge is unconstitutional because it classifies U.S. citizens based on their country of birth and then subjects Plaintiffs and other U.S. citizens to investigation and

---

[1] Plaintiffs are individual registered voters who are naturalized U.S. citizens as well as organizations whose members or clients are naturalized U.S. citizens. *See* Plaintiffs' First Amended Complaint.

additional demands of proof of U.S. citizenship to vote.  Defendants' voter purge also treats Plaintiffs differently across counties, imposes unconstitutional burdens on Plaintiffs' right to vote and violates federal statutes that protect the right to vote.

Without a temporary restraining order, Jane Doe #1 and other Plaintiff voters will suffer imminent and irreparable injury including, among other things, being subjected to a high-profile investigation of their eligibility to vote, cancellation of their voter registration, exposure to criminal investigation and prosecution, being forced to locate and present citizenship documents to the local registrar, and stigmatization as accused non-U.S. citizen voters.  Plaintiff organizations will suffer imminent and irreparable injury including diversion of their resources to educate and assist U.S. citizen voters targeted by the purge and impairment of their ability to fulfill their mission of voter engagement.

Plaintiffs ask this Court to preserve the status quo with an order requiring State Defendants to rescind the purge list and advise the counties and the public that the list does not contain current evidence of non-U.S. citizenship of voters.  Plaintiffs further ask this Court to order Defendant Counties to rescind their purge letters and refrain from investigating or cancelling the voter registration of voters on the purge list without current evidence of non-U.S. citizenship.

## FACTUAL BACKGROUND

### I.   Jane Doe #1 and Other U.S. Citizen Registered Voters Will Be Removed From Voter Rolls Absent Court Intervention

U.S. citizen registered voters, such as Plaintiff Jane Doe #1 will be purged from the Texas voter rolls in less than 21 days without intervention from this Court.  Plaintiff Doe #1 is a U.S. citizen and registered voter of Smith County, Texas.[2]  She applied for her original driver's

---

[2] Exhibit 12 (Declaration of Jane Doe #1) ¶ 6.

license by providing her lawful permanent resident card, commonly known as a green card.[3] Plaintiff Doe #1 subsequently became a U.S. citizen through naturalization[4] and registered to vote in Smith County, Texas.[5]  She voted in the 2018 General Election.[6]

Plaintiff Doe #1 is a college student interested in pursuing a career in public service.[7] She believes her vote is her voice.[8]  Last year, Plaintiff Doe #1 became a volunteer deputy registrar and registered nearly one hundred voters.[9]

Plaintiff Doe #1's name appears of Defendants' purge list.[10]  On January 31, 2019, the Smith County Elections Administrator's office sent a letter to Plaintiff Doe #1 stating "there is reason to believe you may not be a United States citizen."[11]  The letter notified her that if she fails to provide proof of citizenship within 30 days from the date of the letter, her voter registration will be cancelled.[12]

Plaintiff Doe #1 has less than three weeks to meet the Smith County deadline.[13]  Because she is currently working in Austin, and her naturalization certificate and other citizenship paperwork is at her parents' house in Harrison County, Plaintiff Doe #1 faces the burden of travelling to two different counties and back to Austin (a trip she cannot afford) or must place that burden on family members.[14]  Plaintiff Doe #1 feels that she is being treated as a second-class citizen simply because she was born outside the United States.[15]

---

[3] *Id.* ¶¶ 4-5.
[4] *Id.* ¶ 2.
[5] *Id.* ¶¶ 2, 4-5.
[6] *Id.* ¶ 3.
[7] *Id.* ¶ 13.
[8] *Id.*
[9] *Id.*
[10] *Id.* ¶ 7.
[11] *Id.* ¶ 8.
[12] *Id.*
[13] *Id.* ¶ 9.
[14] *Id.*
[15] *Id.*

Plaintiff Doe #1 does not know how she could register again if she is removed from the voter rolls for non-U.S. citizenship.[16]  Without immediate court action, Plaintiff Doe #1 and others like her will lose their franchise in a few short weeks.

## II.   The Secretary of State's Advisory

On January 25, 2019, the Office of Texas Secretary of State released Election Advisory No. 2019-02 ("the Advisory") to all voter registrars in Texas.[17]  The Advisory stated that the Office of the Secretary of State, beginning the following day, would provide to Texas counties information about "individuals who provided documentation to DPS showing that the person is not a citizen of the United States during the process of obtaining or acquiring a Texas Driver License or Personal Identification Card from DPS."[18]

The Advisory stated that the office of the Secretary of State had worked with DPS since March 2018 to "produce actionable information voter registrars" could use for voter list maintenance.[19]  The Advisory further advised counties that "we believe the data we are providing can be acted on in nearly all circumstances."[20]

The Advisory stated that Defendant Whitley's office limited the DPS data that it was going to produce to counties "to individuals who provided valid documents indicating the person is not a citizen of the United States *at the time* the person obtained a Driver License or Personal Identification Card." (emphasis added).[21]

---

[16] *Id*. ¶ 12.
[17] Exhibit 1 (Election Advisory No. 2019-02, Texas Secretary of State (January 25, 2019)).
[18] *Id*.
[19] *Id*.
[20] Exhibit 1 (Election Advisory No. 2019-02, Texas Secretary of State (January 25, 2019)).
[21] *Id*. (emphasis added).

The Advisory stated: "Our office has obtained the preliminary data file for all current (unexpired) Driver License and Personal Identification cards that meet this criteria, and we will run that set of information tomorrow evening."[22]

In creating the list of suspected non-U.S. citizen voters, Defendant Whitley's office compared all current driver's licenses to voting records dating back to 1996.[23]

The Advisory claimed that the criteria used to match registered voters to driver's license records are "some of the strongest possible matching criteria used" by the Secretary of State. The Advisory also explained that if the list being sent by the office of the Secretary of State "provides the registrar with reason to believe the person is no longer eligible for registration . . . the registrar should send a Notice of Examination for Citizenship (Proof of Citizenship) (PDF) Letter."[24]

The Advisory provided county registrars with instructions to send voters a form letter stating:  "Your registration status is being investigated because there is reason to believe you may not be a United States citizen. . . You are now required to confirm your eligibility for registration by providing proof of citizenship to maintain your registration status. . . If you fail to provide this proof of citizenship within 30 days from the date of this letter, your voter registration will be cancelled."[25]

Upon publishing its Advisory, the Texas Secretary of State's office also published a news release on January 25, 2019 announcing that Defendant Whitley "issued an advisory to county

---

[22] *Id.*

[23] Exhibit 63 (Robert T. Garrett, *Texas' top election official: About 58,000 non-citizens cast ballots in state elections since 1996*, Dallas News (January 25, 2019)).

[24] Exhibit 1 (Election Advisory No. 2019-02, Texas Secretary of State (January 25, 2019)); *see also* Exhibit 2 ("Notice to Registered Voter for Proof of Citizenship," Texas Secretary of State).

[25] Exhibit 1 (Election Advisory No. 2019-02, Texas Secretary of State (January 25, 2019)); *see also* Exhibit 2 ("Notice to Registered Voter for Proof of Citizenship," Texas Secretary of State).

voter registrars regarding voter registration list maintenance activities, which include identifying any non-U.S. citizens registered to vote in the State of Texas."[26]

Defendant Whitley claimed that his office had "discovered that a total of approximately 95,000 individuals identified by DPS as non-U.S. citizens have a matching voter registration record in Texas, approximately 58,000 of whom have voted in one or more Texas elections."[27] The press release further emphasized that "[v]oting in an election in which the person knows he or she is not eligible to vote is a second-degree felony in the State of Texas" and declared that the Office of the Secretary of State had "immediately provided the data in its possession to the Texas Attorney General's office, as the Secretary of State has no statutory enforcement authority to investigate or prosecute alleged illegal activity in connection with an election."[28]

Defendant Whitley's news release also stated that his office provided the information about potential non-U.S. citizen to counties "so that the county voter registrar can take action."[29] The news release declared that "[i]f a registered voter is identified as a non-U.S. citizen, he or she *should* receive a Notice of Examination (PDF) from the county voter registrar indicating that his or her registration status is being examined on the grounds that he or she is not a U.S. citizen."[30]

On the same day that Defendant Whitley issued his Advisory and news release, Defendant Attorney General Paxton issued a press release declaring "Texas Secretary of State's Office Discovers Nearly 95,000 People Identified by DPS as Non-U.S. Citizens are Registered to

---

[26] Exhibit 3 (Press Release, *Secretary Whitley Issues Advisory On Voter Registration List Maintenance Activity*, Texas Secretary of State (January 25, 2019)).
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.* (emphasis added).

Vote in Texas."[31]   The news release referenced the Secretary of State's press release and stated that every "instance of illegal voting threatens democracy in our state and deprives individual Texans of their voice."[32] Defendant Paxton further stated "My Election Fraud Unit stands ready to investigate and prosecute crimes against the democratic process when needed."[33]

Also on January 25, 2019, Defendant Paxton tweeted: "VOTER FRAUD ALERT: The @TXsecofstate discovered approx 95,000 individuals identified by DPS as non-U.S. citizens have a matching voter registration record in TX, approx 58,000 of whom have voted in TX elections. Any illegal vote deprives Americans of their voice."[34]

Defendant Governor Abbott also tweeted on January 25, 2019: "Thanks to Attorney General Paxton and the Secretary of State for uncovering and investigating this illegal vote [sic] registration. I support prosecution where appropriate. The State will work on legislation to safeguard against these illegal practices. #txlege #tcot"[35]

On January 27, 2019, two days after Defendant Whitley's office published its press release and Advisory, President Donald J. Trump announced on Twitter: "58,000 non-citizens voted in Texas, with 95,000 non-citizens registered to vote. These numbers are just the tip of the iceberg. All over the country, especially in California, voter fraud is rampant. Must be stopped. Strong voter ID!"[36]

**III.    The Secretary of State's List of "Possible Non U.S. Citizens" Is Based on Arbitrary and Illegitimate Criteria**

---

[31] Exhibit 40 (*AG Paxton: Texas Secretary of State's Office Discovers Nearly 95,000 People Identified by DPS as Non-U.S. Citizens are Registered to Vote in Texas*, Ken Paxton, Attorney General of Texas (January 25, 2019)).
[32] *Id*.
[33] *Id*.
[34] Exhibit 6 (Ken Paxton (@KenPaxtonTX), Twitter (January 25, 2019, 12:37 PM)).
[35] Exhibit 7 (Greg Abbott (@GregAbbott_TX), Twitter, (January 25, 2019, 1:57 PM)).
[36] Exhibit 8 (President Donald J. Trump (@realDonaldTrump), Twitter (January 27, 2019, 5:22 AM))

One business day after releasing the list of 98,000 suspected non-U.S. citizen voters to the counties, Defendant Whitley's office began to contact the counties to say the list was flawed and contained the names of U.S. citizens.[37]

Cameron County Elections Administrator Remi Garza commented publicly that the Secretary of State's office gave Mr. Garza's office information on January 29 "that suggested the numbers they were originally provided 'may have been overstated' and that 'individuals that had already provided proof of citizenship to the DPS office had been included in the original list provided to the county.'"[38]

The Secretary of State's office advised Cameron County on January 29 that "1,590 people[...]were wrongly on the list," then later called Mr. Garza's office to say that "the 1,590 figure was incorrect," but gave no further information.[39]

Also on Tuesday January 29, the Secretary of State's office contacted McLennan County's Election Administrator Kathy Van Wolfe to tell Ms. Van Wolfe "to disregard the list."[40]  Ms. Van Wolfe stated publicly that Defendant Whitley's office told her that "[a]ll those people have proven citizenship."[41]  By the afternoon of January 29, Hidalgo County elections administrator Yvonne Ramón announced that she had "determined there were 100 duplicates" on the list sent to her by the Secretary of State's office.[42]

---

[37] Exhibit 43 (James Barragán, Julieta Chiquillo, and Robert T. Garrett, *Some names in list of 98,000 potential non-citizen voters included 'in error,' county officials say, citing state*,  Dallas News powered by the Dallas-Morning News (January 29, 2019))

[38] Exhibit 43 (James Barragán, Julieta Chiquillo, and Robert T. Garrett, *Some names in list of 98,000 potential non-citizen voters included 'in error,' county officials say, citing state*,  Dallas News powered by the Dallas-Morning News (January 29, 2019)).

[39] Exhibit 45 (Guillermo Contreras and Dylan McGuinness, *State hedges on claim that 100,000 Texas voters aren't citizens, faces federal lawsuit*, San Antonio Express-News (January 29, 2019)).

[40] Exhibit 46 (Cassie L. Smith, *State: All 366 on local list of potential noncitizen voters are citizens*, Waco Tribune-Herald (January 31, 2019)).

[41] *Id.*

[42] Exhibit 45 (Guillermo Contreras and Dylan McGuinness, *State hedges on claim that 100,000 Texas voters aren't citizens, faces federal lawsuit*, San Antonio Express-News (January 29, 2019)).

Also on Tuesday January 29, the Travis County tax assessor-collector, Bruce Elfant, stated publicly that his office was trying to organize a "jumble" of information it received on 4,500 voters into a usable format.  Mr. Elfant further stated "I said to the secretary of state's office this morning, 'It would have been nice if you sent it in a spreadsheet,' [and] they told me, 'Well, we didn't.' A lot of things would have been nice, I guess."[43]

That same day, the Dallas County Elections Administrator Toni Pippins-Poole stated publicly: "We received a call from the state saying . . . Some of the data that they received was flawed. Some of the voters had already provided proof of citizenship."[44]

By Wednesday, January 30, 2019, Harris County had reported that 18,000 individuals on the Secretary of State's list of suspected non-U.S. citizen registrants had already been identified as citizens and that Harris County expected more mistakes to be discovered.[45]

That same day, the McLennan County Elections Administrator announced that all 366 registered voters that the Secretary of State targeted for investigation in that county are U.S. citizens.[46]

The Williamson County Election Administrator, who is also president of the Association of Texas Elections Administrators, announced that more than half of the 2,033 voters on his county's list were being removed after the Secretary of State's phone call.[47]

---

[43] Exhibit 47 (Liam Stack, *Many Texas Voters Whose Citizenship Was Questioned Are in Fact Citizens*, New York Times (January 29, 2019)).

[44] Exhibit 48 (Paul Weber, *Texas tells counties noncitizen voter report may be flawed*, Associated Press (January 29, 2019)).

[45] Exhibit 49 (Associated Press, *18K Houston area voters removed from citizenship check,* The Tribune (January 30, 2019)).

[46] Exhibit 46 (Cassie L. Smith, *State: All 366 on local list of potential noncitizen voters are citizens*, Waco Tribune-Herald, (January 30, 2019)).

[47] Exhibit 50 (James Barragán, Robert T. Garrett, and Julieta Chiquillo, *Tens of thousands removed from potential non-citizen voters list after counties find flawed data*, Dallas Morning News (January 31, 2019)).

In the days following its release of the 98,000 names of voters labelled non-U.S. citizens, the Secretary of State's office called counties to urge them to consult any county records showing that the voters on the list had been registered at a naturalization ceremony.[48]  The Secretary of State's office advised the counties "that some on the lists shouldn't be there because they had already proven their citizenship when they registered to vote at naturalization ceremonies or at a Texas Department of Public Safety office."[49]

Almost immediately after Defendant Whitley released his list of suspected non-U.S. citizen voters to the counties, it became clear that the list contained the names of U.S. citizens who had naturalized and registered to vote after obtaining a Texas driver's license.  Non-U.S. citizens who are authorized to live in the United States are eligible for Texas driver's licenses and identification cards.  Texas requires all non-U.S. citizens who apply for a driver's license to show a permanent resident immigrant card (also known as a "green card") or other document issued by the federal government showing that they are authorized to live in the United States.[50] DPS retains information showing a non-U.S. citizen's authorized presence in the U.S. in that individual's driver's license record.[51]

Adult lawful permanent resident immigrants receive standard Texas driver's licenses that are valid for six years.[52]  Non-U.S. citizens with long-term visas authorizing them to live and work in the U.S. also receive long term driver's licenses.[53]

---

[48] *See* Exhibit 45, *supra*, and Exhibit 51 (Phil Prazan, *County officials: Texas non-citizen voter list is 'too big,' wrong*, KXAN, (January 30, 2019)).

[49] *See* Exhibit 45 (Guillermo Contreras and Dylan McGuinness, *State hedges on claim that 100,000 Texas voters aren't citizens, faces federal lawsuit*, San Antonio Express-News (January 29, 2019)).

[50] *Id.*

[51] *See* Tex. Transp. Code Ann. § 521.041(a); *see also* 37 Tex. Admin. Code § 15.101 (DPS "is required by law to maintain records on licensed drivers.").

[52] *See* Tex. Transp. Code Ann. § 521.271

[53] *Id.* § 521.271(a-2)-(a-4).

Lawful permanent resident immigrants very commonly naturalize and register to vote. There is no requirement for naturalized U.S. citizens to present proof of citizenship to DPS upon naturalization or prior to the expiration of their driver's licenses. A Texas driver's license holder is only required to notify DPS if the person changes address or seeks protection of personal information.[54] As a result, citizenship information is not updated by DPS until after the driver's license holder brings the agency proof of U.S. citizenship; this can be years after the individual is naturalized and registered to vote.

One day after Defendant Whitley released his list of suspected non-U.S. citizen voters to counties, another problem emerged with the list. The Secretary of State's list contained voters who had registered to vote at DPS after becoming U.S. citizens and DPS had already verified their citizenship. The Secretary of State advised the counties that individuals on the suspect voters list with a registration source code known as "source code 64" were U.S. citizens.[55]

The Secretary of State's office reportedly told the Cameron County registrar Mr. Garza on January 29 that Mr. Garza should look for voters on the list who were assigned a "source code 64" by the Secretary of State, and eliminate those voters as having already provided proof of citizenship; this would remove "well over" 1,500 from the Cameron County list of suspected non-U.S. citizen voters.[56]

## IV.    Naturalizations in Texas

Lawful permanent resident immigrants typically become eligible for naturalization in five years.[57] The waiting period is four years for asylees who have permanent resident status and

---

[54] *See id.* § 521.054 (a)-(b).
[55] Exhibit 64 (Alexa Ura, *How An Attempt To Review Texas' Voter Rolls Turned Into A Debacle*, Texas Tribune (February 4, 2019))
[56] *Id.*
[57] *See* 8 U.S.C. § 1427(a).

three years for spouses of U.S. citizens.[58]   Thus, a typical permanent resident immigrant in Texas who obtains a six-year driver's license will be eligible to become a U.S. citizen before that driver's license expires.  It may be several years between the time a new U.S. citizen registers to vote and the time she goes to DPS to renew her driver's license and provide updated citizenship information.

According to the U.S. Department of Homeland Security, for fiscal year 2012 through fiscal year 2017, less than the time period of a standard driver's license, over 340,000 individuals naturalized in Texas.[59]  An average of 58,092 individuals naturalized in Texas in each of those years.[60]

The U.S. Department of Homeland Security also reported, for fiscal year 2012 through fiscal year 2017, that 47% of the immigrants naturalized in Texas were originally from the Latin American countries of Mexico, El Salvador, Guatemala, Honduras, Colombia, Cuba, Peru, and Venezuela.[61] An additional 25% of the immigrants naturalized in Texas were from the Asian countries of China, South Korea, India, the Philippines, Bangladesh, Burma,, Iran, Iraq, Nepal, Pakistan and Vietnam.[62]

According to data from the United States Census Bureau, among Texas naturalized U.S. citizens, 51.7% are Latino and 28.8% are Asian.[63]  Only 11.6% of Texas naturalized citizens are non-Latino White.[64]

## V.     The Matching Procedure Employed by Defendants Has and Will Continue to Target Naturalized Citizens for Investigation and Removal From the Voter Rolls

---

[58] *See* 8 U.S.C. § 1430(a).
[59] *See* Exhibit 65 (DHS statbooks, FY 2012-2017).
[60] *Id*.
[61] *Id*.
[62] *Id*.
[63] Exhibit 39 at 6 (American Community Survey FactFinder, *Selected Characteristics of the Native and Foreign-Born Populations (Texas)*, United States Census Bureau (2017 5-year ACS data))
[64] *Id*.

As of this date, many if not all of the eligible voters erroneously identified as non-U.S. citizens by the Secretary of State are naturalized U.S. citizens.  The matching procedure used by Defendant Whitley to create his list of "Possible Non U.S. Citizens" relies on outdated and inaccurate records from DPS; the resulting list has erroneously identified numerous registered voters in Texas who are U.S. citizens who are properly registered to vote and who could be deprived of their right to vote in Defendants' purge effort.

In preparing his list of "Possible Non U.S. Citizens," Defendant Whitley performed the matching procedure between driver's license records dating back to at least 1996.[65]  Thus, his list of suspected non-U.S. citizen voters includes immigrants who showed proof of authorized presence in the U.S. during the process of obtaining a driver's license decades ago.  Thousands of naturalized citizens who registered to vote are included on the Secretary of State's list of suspected non-U.S. citizen voters.  The errors in Defendant Whitley's matching procedure are systematic, predictable, and specific to foreign-born U.S. citizens.  At the same time that Defendant Whitley was culling naturalized citizens from the voter rolls, his matching procedure did not seek to identify any other registered voters who lacked U.S. citizenship records in the DPS database, including voters who have no driver's license or state ID.

The matching procedure employed by Defendant Whitley will continue to identify naturalized U.S. citizens as suspected non-U.S. citizens registered as voters.  Defendant Whitley's press release stated:

> Going forward, the Texas Secretary of State's office will use information it obtains from DPS on a monthly basis to cross-reference with Texas' statewide voter registration database and match potential non-U.S. citizens who have registered to vote. Once a voter registration is identified as a match, the Texas

---

[65] Exhibit 52 (Gregg Re, *List of 95K ineligible voters on the rolls may be overstated, Texas State Department suggests*, FOX News (January 30, 2019)).

Secretary of State's office will notify the county in which the person is registered so that the county voter registrar can take action.[66]

Thus Defendant Whitley's matching procedure will flag, on a monthly basis, any new registrants whose past driver's license records show they were not U.S. citizens and send those registrants' names to the counties for investigation and possible removal from the voter rolls. The matching procedure will flag, routinely and predictably, every newly naturalized citizen who registers to vote and who already has a Texas driver's license.[67]

## VI.   Defendants Will Not Rescind the Advisory, Withdraw the Suspect Voter List, or Provide Written Guidance to Counties Regarding the Flaws in the Suspect Voter List

On January 31, 2019, former Texas Secretary of State Carlos Cascos, who was appointed by and served two years under Governor Greg Abbott, commented publicly on list of suspected non-U.S. voters: "I think they need to rescind it, do due diligence and make a more accurate list." He further recommended that the Secretary of State "contact everyone and admit to it and say, 'We made an honest mistake,' and recompile the list."[68]

Mr. Cascos also stated that he never went through the type of exercise that led to Defendant Whitley's list of suspected non-U.S. citizen voters: "To my knowledge, that did not occur while I was in office [and] I never saw such a correlation [between DPS and voter role databases]. That discussion never took place."[69]

By contrast, when asked whether he thought the investigation process should stop after local officials found serious issues with the list, Defendant Abbott responded "Listen, this isn't a

---

[66] Exhibit 3 (*Secretary Whitley Issues Advisory On Voter Registration List Maintenance Activity*, Texas Secretary of State (January 25, 2019)).
[67] Exhibit 1 (Election Advisory No. 2019-02, Texas Secretary of State (January 25, 2019)).
[68] Exhibit 53 (Carlos Sanchez, *Former Texas Secretary of State Believes Inaccurate Voting List Should Be Rescinded*, Texas Monthly (January 31, 2019)).
[69] *Id*.

hard and fast list"[70]  and further stated: "This is what we would categorize as a process, a work in process . . . They will get it right."[71]

Williamson County Elections Administrator Chris Davis, stated publicly in an email on Tuesday January 29, 2019, that "Williamson County has also received NO written instructions after yesterday morning's call from the" Secretary's office.[72]

On February 1, 2019, the Secretary of State's office emailed the counties once again, suggesting additional methods to investigate the citizenship of individuals on its list of suspected non-U.S. citizens, including contacting federal immigration authorities.[73]   The Secretary of State's email to the counties neither admitted that its list of suspected non-U.S. citizen voters was flawed nor suggested that counties refrain from investigating the names on the list until state officials could correct the list.[74]   The Secretary of State's email did not provide rules or standards to determine when, if at all, counties should issue Notice of Examination letters to ensure the equal treatment of voters across counties.

As of the filing of this complaint, Defendant Whitley has not:  rescinded his list of suspected non-U.S. citizens; rescinded his Election Advisory; or made any public statement acknowledging that his list of suspected non-U.S. citizen voters is flawed and wrongly identified thousands of naturalized U.S. citizens.

In a February 6, 2019 videotapted interview regarding whether Defendant Governor Abbott still has "confidence in" Defendant Whitley, Defendant Abbott stated that Defendant

---

[70] *Id.*

[71] Exhibit 54 (Ashley Lopez, *Gov. Greg Abbott Says Alleged Noncitizen Voter Purge Is A 'Work In Process,'* KUT (January 31, 2019)).

[72] Exhibit 50 (James Barragan, *Tens of Thousands removed from potential non-citizen voters list after counties find flawed data,* Dallas News (January 31, 2019)).

[73] Exhibit 55 (James Barragán and Julieta Chiquillo, *Texas issues new guidelines for counties to probe whether noncitizens voted*, Dallas Morning News (February 1, 2019)).

[74] Exhibit 4 (Keith Ingram, Ingram Email to Counties Feb. 1, Secretary of State's Director of Elections (February 1, 2019)).

Whitley "did exactly what he was supposed to do: following federal and state law, sending it to the counties and saying, 'counties, listen, we're going to have to rely upon you to further sort this out.'"[75]   Defendant Abbott would not say whether Defendant Whitley had sent his list of suspected non-U.S. citizen voters to the Texas Attorney General for criminal investigation:  "I can't even confirm that that happened[...]All I know is what the process is[...]I know it has to be passed to the counties before it can be confirmed about who is or who is not allowed to be on the voter rolls."[76]

In testimony before the Texas Senate Committee on Nominations on February 7, 2019, Defendant Whitley refused to say that he would withdraw his list of suspected non-U.S. citizen voters despite the fact that there are U.S. citizens on the list.[77]

Defendant Whitley confirmed that the voters on his list are still under investigation: "[t]his maintenance activity is on-going, Senator[…] the counties don't have a timeline when they are completing this maintenance activity; we are working with them every day on it.".[78]

Defendant Whitley further said he was not the appropriate person to tell the Texas Attorney General not to investigate the names on his list of suspected non-U.S. citizen voters: "I think that is a reasonable request[…]I am not sure it is appropriate coming from my office because I do not have any investigatory authority."[79]

---

[75] *FULL EXCHANGE: Gov. Abbott answers questions about voter list*, KXAN (February 6, 2019), available at https://www.kxan.com/video/full-exchange-gov-abbott-answers-questions-about-voter-list_20190207043732/1761153960 (accessed February 7, 2019); *see also* Phil Prazan (@PhilPrazan), Twitter, (February 6, 2019, 1:51 PM) https://twitter.com/PhilPrazan/status/1093265908963909642.
[76] *Id.*
[77] *Id*. at 2:48:59-2:51:00.
[78] *Senate Committee on Nominations on February 7, 2019*, The Texas Senate Audio/Video Archive – 2019 (timestamp: 46:03 – 46:15 and 1:32:48-1:33:15) (February 7, 2019) available at http://tlcsenate.granicus.com/MediaPlayer.php?view_id=45&clip_id=13804 (accessed February 8, 2019).
[79] *Id*. at 2:51:27-2:52:07.

**VII.    Counties Continue to Investigate and Send Challenge Letters Using Wildly Different Standards**

Some counties sent Notice of Examination letters to every voter on the Secretary of State's list of suspected non-U.S. citizens.[80]  Even counties that try to limit the number of Notice of Examination letters they send by first trying to find evidence of U.S. citizenship are continuing their investigation.  However, counties are using wildly different standards to conduct their investigations into citizenship status.

Some counties, like Galveston County, sent Notice of Examination letters to all registered voters on their list of suspected non-citizen voters, but sent retraction letters to some of those individuals after narrowing their list of names following discussions with the Secretary of State's office.[81]

Smith County, in contrast, reviewed names first, tried to remove any individual it could determine is a U.S. citizen, and then sent letters that same week to the remaining individuals on the County's suspected non-citizen list, including Jane Doe #1.  Smith County's registrar Defendant Nelson stated publicly:  "We got the file from the state on Monday . . . We are working through the list and looking at each person on the list to see if any of the cases can be resolved by our office before sending the voter a letter of examination. We have to send a letter of examination to each person whose case cannot be resolved . . . We expect to get the letters sent out by the end of this week."[82]  Smith County sent its letter to Jane Doe #1 on January 31, 2019, apparently after trying and being unable to "resolve" her voter registration using its own records and SOS records.

---

[80] Exhibit 67 (Hank Murphy, *Letters go out to 21  Wood County voters inquiring about citizenship*, Wood County Monitor)
[81] The letter sent to Elena Keane was followed by a second letter.
[82] Exhibit 38 (LouAnna Campbell, Smith County elections office looking into 297 possible non-U.S. citizens registered to vote, Tyler Morning Telegraph (January 29, 2019)).

Travis County intends to follow a procedure similar to Smith County's, but it will not send letters unless and until it completes a manual review of every name on its list. Pursuant to this manual review, Travis County will determine if any of its voluntary deputy registrars registered any individual on the list at a naturalization ceremony in the County.[83]

Other counties, such as Hidalgo County, cannot perform the same type of manual review as Travis County because the county does not send registrars or deputy registrars to naturalization ceremonies. Hidalgo County intends to rely on Plaintiff LUPE to identify some members on the County's suspected non-citizens list through LUPE's review of the organization's records.[84]

As a result of these arbitrary and disparate standards, Plaintiffs are being treated differently depending on the county in which they reside. For example, in Galveston County, Plaintiff Kean received a letter demanding that she provide proof of citizenship, and then received a second letter retracting the first. Now she is worried that if she votes again she will be criminally investigated.[85]

In Wood County, Plaintiff Doe #2 received a Notice of Examination letter, without letterhead, which stated: "If you should have any questions concerning this notice, please contact me at _____ (phone number)," but the space for the phone number was left blank. The letter also purported to enclose a response form, but no such form was enclosed. Plaintiff Doe #2 searched the internet and called County employees, one of whom told her the letter might be fake, until she understood the significance of the letter. Plaintiff Doe #2 was only able to prove her citizenship by calling and ultimately going in person to the county courthouse,

---

[83] Exhibit 9.
[84] Exhibit 22.
[85] [Exhibit 14, forthcoming].

virtually ensuring that other voters in Wood County will be purged because they do not know where to send their proof of citizenship or whom to call with questions.[86]

Other voters are waiting in limbo because the counties in which they are registered to vote have not sent any letters, but have not disavowed their suspected non-citizen lists and maintain that they are still investigating the voters on the list.  These voters are stigmatized and still under investigation.[87]

Absent court intervention, any of these registered voters sent a notice letter will be removed from the voter rolls if the voter does not respond to the letter or the letter is not recalled.

## LEGAL STANDARD

Preliminary injunctions favor the status quo and preserve the relative positions of the parties until a trial on the merits can be held.  *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997); *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  The decision to grant or deny a preliminary injunction is within the discretion of the trial court.  *See Texas v. United States*, 809 F.3d 134, 184 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam).

A party seeking a temporary restraining order or other injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure has the burden to demonstrate each of four elements:  (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the temporary restraining order is denied, (3) that the threatened injury if the temporary restraining order is denied outweighs any harm that will result if the temporary restraining order is granted, and (4) that the grant of an temporary restraining order will not disserve the public interest.  *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014) (quoting *Hoover v.*

---

[86] Exhibit 13.
[87] *See, e.g.,* Exhibit 16-21.

*Morales*, 164 F.3d 221, 224 (5th Cir. 1998)); *see also Jones v. Texas Dep't of Criminal Justice,* 880 F.3d 756, 759 (5th Cir. 2018).

## ARGUMENT

Plaintiffs satisfy each of the four requirements for a preliminary injunction.[88]

### I.        Plaintiffs are Likely to Prevail on the Merits of Their Claims

In order to demonstrate likelihood of success on the merits, a plaintiff "must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013), citing *Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011); *see also Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979)("A preliminary injunction may issue, however, despite the existence of a plausible defense, as long as the movant demonstrates a substantial likelihood of success.").

### A.  The Voter Purge Violates the Fourteenth Amendment Equal Protection Clause

The Fourteenth Amendment to the U.S. Constitution prohibits states from treating U.S. citizens differently based on their country of birth.[89]

The Equal Protection Clause "is essentially a mandate that all persons similarly situated must be treated alike." *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996). When a "challenged government action classifies or distinguishes between two or more relevant groups," courts must conduct an equal protection inquiry to determine the validity of the classifications.

---

[88] Plaintiffs incorporate by reference the facts and allegations in their Amended Complaint, filed on this date.
[89] Section 1 of the Fourteenth Amendment provides:  "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. . . . No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

*Qutb v. Strauss*, 11 F.3d 488, 491 (5th Cir. 1993). In situations where the distinction involves an inherently suspect class, the differing treatment of state action is subject to a strict scrutiny standard of review. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988) (explaining that national origin classifications are subject to strict scrutiny). National origin is a suspect classification. *Hernandez v. State of Tex.*, 347 U.S. 475, 479 (1954) ("The exclusion of otherwise eligible persons from jury service solely because of their ancestry or national origin is discrimination prohibited by the Fourteenth Amendment.")

All Texas voters are similarly situated:  they registered to vote and swore, under penalty of perjury, that they are U.S. citizens.  Defendants' suspect voter list selects registered voters solely on the criteria that they legally immigrated to the United States in the past and subsequently registered vote.  As a result, the only voters singled out for investigation, threatened removal from the voter rolls and possible criminal prosecution are voters who were born outside the United States.

 Defendants' selection of Plaintiff voters because they immigrated to the U.S., and subsequent different treatment in requiring these voters to prove their U.S. citizenship with documents or face loss of their right to vote, is discrimination on the basis of national origin.

If a classification disadvantages a "suspect class" or impinges upon a "fundamental right," it is subject to strict scrutiny. *Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993) (citing *Plyler v. Doe*, 457 U.S. 202, 216–17 (1982)).  In the strict scrutiny analysis, there is no presumption of constitutionality and the classification "must promote a compelling governmental interest, and it must be narrowly tailored to achieve this interest." *Id*.

**B.  Defendants Lack a Compelling Interest in Singling our Naturalized Citizens for the Voter Purge**

Defendants have no compelling interest in selecting Plaintiff voters for disparate treatment based on their national origin.  First, although Defendants may have a compelling interest in ensuring that only U.S. citizens are registered to vote, Defendants have selected only Plaintiffs and other naturalized citizens for the purge, as opposed to all voters about whom Defendants lack documentary proof of citizenship.  Many voters on the Texas rolls have sworn to their U.S. citizenship on their voter registration application and have no matching citizenship documents in the DPS database.  This entire group of voters was not selected for the purge.  Only the subset of registered voters for whom Defendants found a document in the DPS database showing that the voters lawfully immigrated to the U.S. have been targeted for investigation and removal from the rolls.  Defendants have no compelling interest in singling out only naturalized U.S. citizens for investigation into their citizenship if Defendants' goal is to confirm the U.S. citizenship of all voters.

Second, no law requires Defendants' voter purge, which falls far outside state and federal authorization for voter roll maintenance.   The Texas Election Code requires voter registrars to investigate or remove a voter from the rolls upon learning that the voter is no longer eligible.[90] The Texas Election Code authorizes the voter registrar to cancel a voter registration immediately upon notice that the voter has died, been adjudicated mentally incompetent, been convicted of a felony or moved outside the county (when the notice of change in residence is provided by the voter or another county registrar),.[91]  All of this information must reflect the current status of the voter.  In addition to the grounds for immediate cancellation, the Texas Election Code authorizes a voter registrar who has reason to believe that a voter "is no longer eligible for registration" to

---

[90] *See generally*, Tex. Elec. Code § 16.031 - 16.0332.
[91] *See* Tex. Elec. Code § 16.031 (listing reasons for which registrars may immediately cancel registration).

send a notice to the voter indicating that the voter's registration status is under investigation by the registrar and the voter must provide proof of eligibility within 30 days.[92]

With respect to a voter's citizenship, the Texas Election Code only authorizes voter registrars to act on current information that the voter is not a U.S. citizen.  The registrar must send a notice requiring proof of U.S. citizenship upon receiving information that the voter was excused or disqualified from jury service because of citizenship status.[93]  The Texas Secretary of State provides quarterly reports to inform county registrars of any registered voters who have been excused or disqualified from jury service because the voter is not a U.S. citizen.[94]

Section 8 of the National Voter Registration Act (NVRA), 52 U.S.C. §20507, requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant; or . . . a change in the residence of the registrant."  52 U.S.C. §20507(a)(4).  Although the NVRA contemplates that states would remove voters from the rolls for ineligibility, the NVRA does not authorize states to investigate or remove from the rolls voters who were not U.S. citizens at some point in the past.  52 U.S.C. §20507(a)(3).

Defendants' voter purge, which selects voters for investigation and removal from the voter rolls based on records showing the voters immigrated to the United States at some point in the past, is not authorized by state or federal law.

## C.  Defendants' Voter Purge is not Narrowly Tailored

Furthermore, Defendants' voter purge procedure is not narrowly tailored.  Defendant Whitley claimed that the purge list selected individuals because they "provided valid documents indicating the person is not a citizen of the United States *at the time* the person obtained a Driver

---

[92] *See* Tex. Elec. Code § 16.033.
[93] *See* Tex. Elec. Code § 16.0332(a).
[94] *See* Tex. Elec. Code § 18.068.

License or Personal Identification Card." (emphasis added).[95]  Defendants did not select Plaintiff voters for investigation based on information showing that Plaintiffs are currently not U.S. citizens.  Instead, Defendants rely on data from DPS which shows only that Plaintiffs lawfully immigrated to the United States in the past.  Because DPS issues driver's licenses to lawful permanent residents ("green card" holders) for six year terms, and most lawful permanent residents become eligible for naturalization in three or five years, Defendants' use of motor vehicles records to select voters for investigation is guaranteed to provide incorrect information about voters (but only those who are naturalized citizens).  Defendants' use of DPS records provides no evidence at all that Plaintiffs and the other voters targeted in the purge are not U.S. citizens today.  Defendants could easily have tailored their use of DPS records to identify registered voters who provided DPS an immigration document after registering to vote, but chose not to.

Defendants are well aware that their suspect voter list contains thousands of U.S. citizens. In fact, the office of Defendant Whitley advised county election officials one day after releasing the purge list that there were naturalized U.S. citizens on the list who had already provided citizenship documents to the Department of Public Safety or who had registered to vote outside of naturalization ceremonies.  Instead of withdrawing the list, Defendant Whitley insists that counties move forward and investigate the citizenship status of the individuals on the purge list. The fact that thousands of U.S. citizens are on Defendants' suspect voter list demonstrates that Defendants' voter purge procedure is not narrowly tailored.

In sum, by using DPS data to cull from the voter rolls *only* voters whose past documents show they lawfully immigrated to the United States, Defendants' voter purge surgically targets registered voters who are naturalized citizens for investigation and removal from the voter rolls.

---

[95] Exhibit 1 (Election Advisory No. 2019-02, Texas Secretary of State (January 25, 2019))

At the same time, Defendants have not investigated the citizenship status of any other voters on the rolls for whom there is no DPS citizenship match, leaving those other registered voters outside the scope of the purge.  No law compels the targeting of naturalized U.S. citizens for investigation, and Defendants are well aware that their purge program is not narrowly tailored because it has captured thousands of U.S. citizens for disparate treatment.

### D.  The Voter Purge Violates the 1964 Civil Rights Act

The 1964 Civil Rights Act provides, in relevant part:

> No person acting under color of law shall [] in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote.

52 U.S.C. § 10101(a)(2).

Defendants, who are acting under color of law, have imposed additional requirements and procedures to prove eligibility to vote upon Plaintiff voters and the people served by Plaintiff organizations that they do not impose on other individuals that have been found to be qualified to vote.  Under Texas law, individuals are registered to vote after completing a registration application and swearing to their eligibility, including U.S. citizenship, under penalty of perjury. Defendants apply to Plaintiffs and others additional practices and procedures as a condition of voting, solely because Plaintiffs and others immigrated to the United States.  Although many registered voters in Texas do not have matching citizenship records at DPS, Defendants have singled out Plaintiffs and other naturalized U.S. citizen voters for these additional requirements and procedures to prove U.S. citizenship.  Thus, although all voters must be U.S. citizens, Defendants have applied the purge and documentary proof of citizenship procedures to Plaintiffs and refrained from applying those same procedures to the many other voters who lack a

document in state records showing U.S. citizenship. *See, e.g. United States v. Ward*, 345 F.2d 857, 861 (5th Cir. 1965) (concluding that the registrar's enforcement of voter eligibility requirements varied between voter registrants and showed a pattern and practice of discrimination); *United States v. Lynd*, 349 F.2d 785, 786 (5th Cir. 1965) (discussing registrar's "using a double standard in the [determination whether voter registrants met eligibility requirements] between white and Negro applicants").

By applying different procedures to Plaintiffs as a condition of voting, Defendants violate the 1964 Civil Rights Act, 52 U.S.C. § 10101.  Defendants' actions also discourage other naturalized citizens from registering to vote by causing them to fear that if they register they will be subjected to the same public investigation as the Plaintiffs.  *See, e.g. United States v. Crawford*, 229 F. Supp. 898, 902 (W.D. La. 1964)*, rev'd on other grounds and injunction granted sub nom. United States v. Clement*, 358 F.2d 89 (5th Cir. 1966) ("From the evidence adduced it is reasonable to infer that other Negroes otherwise qualified to vote were discouraged from attempting to register by the discriminatory acts of the Registrar.")

### E.  The Voter Purge Violates the Fourteenth Amendment Equal Protection and Due Process Clauses Because it Treats Voters in a Disparate and Arbitrary Manner

The Fourteenth Amendment requires election officials to avoid arbitrary and disparate treatment of the members of the electorate. *Bush v. Gore*, 531 U.S. 98, 104–05 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.") *citing Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665 (1966).  *See also Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 234 (6th Cir. 2011) ("We are therefore guided in our analysis by the important requirement that state actions in election processes must not result in "arbitrary and disparate treatment" of votes.").

Defendants' voter purge is riddled with inconsistent treatment by state and local officials and lacks rules and guidance from State Defendants to ensure uniform treatment of voters. First, Defendant Whitley selected the voters for his list of suspected non-U.S. citizens from the larger universe of voters who lack citizenship records in the DPS database, based only on their national origin. That arbitrariness alone dooms the purge program under the Fourteenth Amendment. Second, the standards for the voter purge vary wildly across counties. Some counties, like Wood County, sent Notice of Examination Letters to every voter on the suspect voters list provided by the Secretary of State. Galveston County sent letters to all the voters on the suspect voter list then sent retraction letters to some but not all of those voters. Smith County removed some names from the suspect voters list and sent letters to the remaining voters, including Jane Doe #1. Some counties have lists of voters that they registered outside of naturalization ceremonies. Others counties have no lists. State officials have provided no written guidance or rules to assist states in determining which voters to challenge, leaving the counties to act in an arbitrary manner.

As a result, the very public investigation into Plaintiffs' citizenship has employed varying standards county by county and the voter purge does not satisfy the minimum requirement for non-arbitrary treatment of voters necessary to secure the fundamental right to vote.

## II.      Plaintiffs will Suffer Irreparable Harm if an Injunction is not Granted

It is well settled that the violation of constitutional rights for even a minimal period of time constitutes irreparable injury justifying the grant of a preliminary injunction. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B. Nov. 1981) (*citing, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976); *DeLeon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. DeLeon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("Federal

courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law."); *see also Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

Plaintiff Jane Doe #1 is threatened with the loss of her right to vote in less than 21 days.  Her threatened injury is both imminent and irreparable.  Plaintiff Jane Doe #1 has already suffered from being subjected to an investigation of her citizenship and the stigma of being suspected of registering and voting illegally.  Because the list of suspect voters on which her name appears has been sent to the Texas Attorney General, Plaintiff Jane Doe #1 faces the continued threat of criminal investigation and prosecution based on flawed information disseminated by the Texas Secretary of State and used by her county. *See* Ex. 12 (Doe #1 Decl.) and Ex. 23.  This has caused Plaintiff Doe #1 to feel like she is a second class citizen.  *See id*. at ¶ 10.

Plaintiff Jane Doe #2, Maria Felicita Barbosa and Elena Keane have already suffered from being subjected to an investigation of their citizenship and the stigma of being suspected of registering and voting illegally, as well as the burden of having to locate their citizenship documents, travel to the county elections office and go through the embarrassment of proving their U.S. citizenship when they are already naturalized citizens.  In addition, because the list of suspect voters on which their names appear has been sent to the Texas Attorney General, Plaintiffs Jane Doe #2, Barbosa and Keane face the continued threat of criminal investigation and prosecution based on flawed information disseminated by the Texas Secretary of State and used by their counties.  *See* Ex.s 13, 14, 15  (Doe #2 Decl., Barbosa Decl. and Keane Decl.); see also Ex.s 24, 25, 26 (Notice of Examination letters to Plaintiffs Doe #2, Barbosa and Keane).

Plaintiff Julieta Garibay, who has confirmed that her name is on the list of suspect voters sent to her county and confirmed that she is under investigation for non-U.S. citizenship faces the imminent threat of continued investigation, a Notice of Examination letter and cancellation of her voter registration.  *See* Ex. 16 (Garibay Decl.) at ¶ 8.  Plaintiffs Garcia, Tule-Romain, Espinosa Flores, Carrizales, and Gomez all believe that they are on the list of suspected non-U.S. citizens registered to vote because they naturalized as U.S. citizens and registered to vote after obtaining a driver's license at DPS.  They face the imminent threat of continued investigation, a Notice of Examination letter and cancellation of their voter registration.  *See* Ex. 21 (Garcia Decl.) at ¶ 6, Ex. 20 (Tule-Romain Decl.) at ¶ 6, Ex. 17 (Espinosa Flores Decl.) at ¶¶ 6-7, Ex. 19 (Carrizales Decl.) at ¶ 6, and Ex. 18 (Gomez Decl.) at ¶ 6.  In addition, because the list of suspect voters on which their names appear has been sent to the Texas Attorney General, Plaintiffs Garibay, Garcia, Tule-Romain, Espinosa Flores, Carrizales, and Gomez face the continued threat of criminal investigation and prosecution based on flawed information disseminated by the Texas Secretary of State and used by their counties.  *Id.*

Plaintiff LUPE has diverted and faces the imminent threat of continued diversion of its funds, resources, and time away from fulfilling its core mission and activities.  Instead, LUPE will have to assist its members targeted in the purge, educate all of its members about their rights, help re-register wrongly purged voters and bear the costs of voter deterrence in the reduction in its ability to mobilize voters. Ex. 22 (LUPE Decl.) at ¶¶ 7-24.

Here, where Plaintiffs have demonstrated that without the Court's intervention they will suffer, among other things, loss of their right to vote, further investigation of their U.S. citizenship by state and local officials, and stigma, Plaintiffs have demonstrated irreparable injury. *See, e.g., Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 471 (5th Cir.

2017), *cert. denied*, 139 S. Ct. 408 (2018) (finding irreparable harm where "[i]ndividual Plaintiffs would otherwise be denied both access to a much needed medical provider and the legal right to the qualified provider of their choice[.]").

### III.    Plaintiffs' Threatened Injuries Outweigh any Alleged Injury to Defendants

The equities tip heavily in favor of granting an injunction that halts Defendants' voter purge.  Plaintiffs simply seek to maintain the status quo by enjoining Defendants from purging properly registered voters from voter rolls in violation of the Constitution and federal statute. *See Chalk v. United States Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988); *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997).

The harm to Plaintiffs—who may lose their ability to vote, be stigmatized as illegal voters, and be criminally investigated—far outweighs the effects an injunction will have on Defendants, who have no interest in pursuing flawed voter purge.  *See Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016) (balance weighed in favor of citizens eligible to vote moving for injunction against state).  As Plaintiffs describe in their declarations, Defendants' voter purge not only has the potential to disenfranchise them as voters and subject them to criminal investigation, but it also causes Plaintiffs worry that they have done something wrong and fearful about losing their right to vote.

In addition, Defendants' voter purge may result in the cancellation of eligible voters' registration and therefore create a new burden on voters to challenge their cancellation by requesting and participating in a hearing with the voter registrar.  *See* Tex. Elec. Code Ann. §§ 16.061-16.064 (challenge of cancellation hearing process).  Defendants have no reason to continue a purge based on no current evidence of non-U.S. citizenship when there are other

mechanisms available for investigating potentially ineligible voters.  *See* Tex. Elec. Code Ann. §

16.0332 (voter registrars "shall deliver" notice requiring proof of citizenship to persons found on

monthly list of "persons excused or disqualified from jury service because of citizenship status").


### IV.     A Preliminary Injunction Would Serve the Public Interest

It is "always" in the public interest to prevent violations of individuals' constitutional

rights. *Deerfield Med. Ctr.*, 661 F.2d at 338-39; *Melendres v. Arpaio*, 695 F3d 990, 1002 (9th

Cir. 2012) (Fourth Amendment); *Wis. Right to Life, Inc. v. Barland,* 751 F.3d 804, 830 (7th Cir.

2014) (First Amendment).  It is also in the public interest not to allow a state to violate the

requirements of federal law.  *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

And the government has no interest in enforcing an unconstitutional law. *N.Y. Progress & Prot.*

*PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).  Protecting the right to vote is of particular

public importance because it is "preservative of all rights."  *See Dunn v. Blumstein*, 405 U.S.

330, 336 (1972) (citing *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)).  There is "a great public

interest in not removing names from state rolls in violation of federal law."  *A. Philip Randolph*

*Inst. v. Husted*, 907 F.3d 913, 922 (6th Cir. 2018); *see also Hunter v. Hamilton Cty. Bd. of*

*Elections*, 635 F.3d 219, 244 (6th Cir. 2011) (public's interest in protecting right to vote "is best

served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to

vote is successful").

The continuation of Defendants' voter purge does not serve the public interest because it

is discriminatory and will deny Plaintiffs their right to vote.  *See Patino v. City of Pasadena*, 229

F. Supp. 3d 582, 590 (S.D. Tex. 2017) (government's interest in enforcement of laws "can weigh

only weakly in" government's favor where there is intentional discrimination in violation of

Fourteenth Amendment). Plaintiffs have presented substantial evidence that Defendants' purge may disenfranchise Plaintiffs; Defendants will experience no harm from refraining from cancelling the registration of eligible voters. *See Jones v. Texas Dep't of Criminal Justice*, 880 F.3d 756, 760 (5th Cir. 2018) (injunction in public interest where there was no evidence of "substantial difficulty that would ensue from ensuring that" movant state inmate would receive necessary medical care and food); *see also Fish v. Kobach*, 189 F. Supp. 3d 1107, 1151 (D. Kan.), *aff'd*, 691 F. App'x 900 (10th Cir. 2016), and *aff'd*, 840 F.3d 710 (10th Cir. 2016) (injunction of registration law in public interest because "even if instances of noncitizens voting cause indirect voter disenfranchisement by diluting the votes of citizens, such instances pale in comparison to the number of qualified citizens who have been disenfranchised by this law").

## CONCLUSION

For the reasons set out above, Plaintiffs respectfully request that the Court issue a temporary restraining order:

(a) Enjoining Defendants, and all others acting in concert with them, from using for any matter of voter registration, the administration of elections, or investigations regarding eligibility to vote, any records maintained by the Texas Department of Public Safety showing non-U.S. citizenship prior to the date of a voter's registration to vote;

(b) Enjoin Defendants, and all others acting in concert with them, from investigating or instructing any other person or entity to investigate the eligibility to vote of any voter identified through records obtained from the Texas Department of Public Safety that show non-U.S. citizenship prior to the date of the voter's registration to vote;

(c) Enjoin Defendants, and all others acting in concert with them, from issuing or instructing any other person or entity to issue a letter, notice, or advisory (including Notices of Examination) regarding any matter of voter registration, the administration of elections,

or eligibility to vote based on records maintained by the Texas Department of Public Safety showing non-U.S. citizenship of a voter prior to the date of the voter's registration to vote.

(d) Order Defendants county voter registrars to refrain from cancelling, and must reinstate, the voter registration of any voter following investigation into eligibility to vote based on records maintained by the Texas Department of Public Safety showing non-U.S. citizenship of the voter prior to the date of a voter's registration to vote.

(e) Order Defendants to announce publicly that Defendant Whitley's list of suspected non-citizen voters does not contain current evidence of non-U.S. citizenship of voters and announce publicly the contents of the Court's injunction.

Dated:  February 11, 2019

Respectfully Submitted,

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
By:  */s/ Nina Perales*
Nina Perales (Tex. Bar No. 24005046);
Attorney-in-Charge
Ernest I. Herrera (Tex. Bar No. 24094718)
(SD of Tex. Bar No. 2867694)
Alejandra Ávila (Tex. Bar No. 24089252)
(SD of Tex. Bar No. 2677912)
Jack Salmon (Tex. Bar No. 24068914)
(SD of Tex. Bar No. 1130532)
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone:  (210) 224-5476
Facsimile:  (210) 224-5382
Email: nperales@maldef.org
Attorneys for Plaintiffs

## CERTIFICATE OF CONFERENCE

I, the undersigned, hereby certify that on February 8, 2019, I conferred with counsel for Defendants Whitley, Paxton and Abbott (State Defendants) regarding this Application.  Counsel for State Defendants indicated that they are opposed to the Application.  I also certify that I sent electronic mail on February 8, 2019 to Mr. Bob Boemer, of the Galveston County's District Attorney's Office seeking the position of Defendant Cheryl Johnson on the Application.  Mr. Boemer responded by telephone and conveyed that Galveston County had not yet selected counsel for this case and thus he was unable to provide Defendant Johnson's position on the Application.

*/s/ Nina Perales*
Nina Perales

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on the 11th day of February, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.  I also sent, by electronic mail, a copy of this Application to counsel for State Defendants and to Mr. Bob Boemer, of the Galveston County's District Attorney's Office.  I further sent, by electronic mail, the above and foregoing document to the following attorneys in their respective county offices:  Jesse Skinner (Austin County) and Thomas Wilson (Smith County).  I further sent, by facsimile, the above and foregoing document to Angela Albers in the District Attorney's office of Wood County, f. 903-763-5105.

*/s/ Nina Perales*
Nina Perales